**KAVANEY REALTOR & DEVELOPER, INC., Plaintiff and Appellant,**

v.

**The TRAVELERS INSURANCE COMPANY, Defendant and Appellee.**

**Civ. No. 920230.**

Supreme Court of North Dakota.

June 16, 1993.

Bard Law Offices, Bismarck, for plaintiff and appellant; argued by Dean F. Bard. Appearance by Jack Kavaney.

Nilles, Hansen & Davies, Ltd., Fargo, for defendant and appellee; argued by H. Malcolm Pippin.

LEVINE, Justice.

Kavaney Realtor and Developer, Inc. (KRD), appeals from a district court judgment[1] awarding it $499.75 in its suit to recover under insurance policies issued by The Travelers Insurance Company (Travelers). We affirm in part, reverse in part, and remand for further proceedings.

KRD is a Subchapter S corporation, of which John W. Kavaney is the president and his wife the secretary-treasurer. KRD is engaged in the real estate business, land development and the management of real estate owned by others. KRD maintains several checking accounts of its own and others, into which it makes deposits and upon which it draws checks.

Travelers issued three policies to KRD. All the provisions of the policies were identical, except for liability limits and premiums. The first policy, issued in 1983, was "Effective from 05–12–83 to 05–18–84." Coverage B provided insurance for personal property up to a liability limit of $20,000, with a deductible amount of $100, for loss arising from dishonest acts of employees. The policy said that the limit of liability was not cumulative, regardless of how many years the policy was in force. The policy also said that it "applies to loss occurring only during the policy period", except that it did extend coverage to losses, which would have been recoverable under a prior policy, had it not expired. The limit of liability for those prior losses was $20,000, which was the limit under this policy, or an amount equal to the limit under the prior policy, if less. The premium for the policy was $200.

A second policy was "Effective from 05–18–84 to 05–18–85." Coverage B again insured personal property up to a liability limit of $20,000. The premium was $250. That policy was followed by a third, "Effective from 05/18/85 TO 05/18/86." Coverage was added for a second location. Coverage B was increased to $22,000. The

---

1. KRD also appealed from a partial summary judgment. While not appealable under § 28–27–02, N.D.C.C., that intermediate order is reviewable under Rule 35, N.D.R.App.P., upon the appeal from the judgment. The case was initially assigned to the Honorable Larry M. Hatch, who ruled on the parties' pretrial cross-motions for partial summary judgment. Judge Hatch retired before the case was tried on the merits. The case was later tried before the Honorable Dennis A. Schneider.

premium was $385. The second and third policies had the same "noncumulation" and "prior loss" provisions as the first policy.

During the time that the insurance policies were in effect, Rhonda K. Otto, a KRD employee, misappropriated funds from several checking accounts owned by KRD or maintained by KRD on behalf of other owners. KRD sued Travelers under the insurance policies, to recover $66,000 for the loss of personal property belonging to it and others, $1,000 for the cost of reproducing KRD records unlawfully taken by Otto and $1,000 for preparing and filing the proof of claim form to recover under the policies. Travelers denied liability.

On cross-motions for partial summary judgment, KRD contended that the three insurance policies were separate contracts and Travelers' liability was cumulative, while Travelers contended that the policies constituted one continuous contract and that its liability was not cumulative. The district court granted Travelers' motion for partial summary judgment and denied KRD's motion for partial summary judgment, concluding that the policies constituted one continuous contract, that Travelers' liability was not cumulative and that Travelers' liability could not exceed $22,000.

After a bench trial, the district court determined:

"During the term of these policies, Mrs. Otto wrongfully appropriated to herself (and for criminal law purposes embezzled or stole) funds from at least five accounts which were being handled or managed by the plaintiff or its president, Mr. Kavaney. Evidence was presented that at least $4,000 was taken during the first policy period, $46,125 during the second, and $31,550 during the third policy (totaling at least $81,675).

"The Court finds these amounts to have been proven as being taken during those times by Mrs. Otto. However, as already noted, the defendant's exposure is for a maximum of $22,000 total during the three year period."

The trial court found that KRD had an insurable interest in the subject accounts, that the accounts were personal property, that "[t]he accounts, ledgers, checkbooks, and statements were normally kept on the plaintiff's premises" and that "these accounts (moneys) were within the plaintiff's care, custody, and control." The court further determined, however, "that these accounts were not usual or incidental to the plaintiff's business" and that "[t]he losses sustained here were not covered by the policies." The court did find that KRD's expenditure of $499.75 to reconstruct records taken by Otto was a covered loss.

■ Judgment was entered in favor of KRD for $499.75, plus interest, costs and disbursements. KRD appealed, contending that the trial court erred in determining that the accounts from which Rhonda Otto embezzled funds were not "usual or incidental" to KRD's business and that the district court erred in determining that the insurance policy involved "was one continuous policy rather than three separate policies."

The policy provides insurance protection to:

"business personal property (including exterior signs) owned by the Named Insured; at the option of the Named Insured, personal property of others while in his care, custody or control; and *tenants improvements and betterments;* all usual or incidental to the Named Insured's business." (Italics in original.)

KRD contends that the trial court's determination that the bank accounts from which Otto embezzled funds were not usual or incidental to KRD's business is a fully reviewable conclusion of law. Travelers counters that the trial court's determination is a finding of fact subject to the "clearly erroneous" standard of Rule 52(a), N.D.R.Civ.P. "Findings of fact are the realities as disclosed by the evidence as distinguished from their legal effect or consequences." *E.E.E., Inc. v. Hanson*, 318 N.W.2d 101, 104 (N.D.1982). We believe that evidence that goes to the question of whether something is "usual or incidental" depicts realities, *i.e.*, describes actual events or things, and is not a conclusion of law, *i.e.*, derived from applying a rule of law. Accordingly, we will treat the trial

court's determination on this matter as a finding of fact. *See American Mfrs. Mut. Ins. Co. v. Wilson–Keith & Co.*, 247 F.2d 249, 252 (8th Cir.1957) (The trial court submitted to the jury the question of whether the use of chemicals "was usual and incidental in the business".); *Washington County Farmers Mut. Fire Ins. Co. v. Phillips*, 34 Ark.App. 198, 807 S.W.2d 940, 943 (1991) (Whether stamp vending machines were "usual and incidental to the occupancy of the premises as a dwelling" was a jury question.)

■ The policies do not define "usual", "incidental", or "usual or incidental to the Named Insured's business." *Webster's Third New International Dictionary*, 2524 (G. & C. Merriam Co. 1971) defines "usual":

> "[1] *usual* ... *1:* such as accords with usage, custom, or habit: of the character or amount in common use: PREVALENT, ACCUSTOMED ... *2:* commonly or ordinarily employed ... *3:* such as occurs in ordinary practice or in the ordinary course of events: ORDINARY, COMMON...."

The same authority defines "incidental":

> "[1] *incidental* ... *1:* subordinate, nonessential, or attendant in position or significance: as *a:* occurring merely by chance or without intention or calculation: occurring as a minor concomitant ... *b:* being likely to ensue as a chance or minor consequence."

*Id.* at 1142. Thus, the personal property of others is covered if its care, custody or control by KRD is either usual, in that its care, custody or control by KRD is customary, prevalent, common, or ordinary; or incidental, in that its care, custody or control by KRD is nonessential, unintended or a minor consequence of its services to others.

■ There is ample support for the trial court's finding that two of the accounts were not "usual or incidental" to KRD's business. One of the bank accounts found to be not usual or incidental to KRD's business was the CRK Construction Account, a checking account at First Bank. John Kavaney testified: that the account was owned by Charles R. Kavaney, who "had built some homes in the seventies, and that was his account that he used for his construction funds and such"; that Charles Kavaney "left to go to the seminary" in 1981; that it was a dormant account, the usefulness of which had ended in 1981; that all of Charles Kavaney's "records were left in our care when he left for the seminary, and as part of her duties for me [Otto] was looking out for his accounts"; and that "[t]he CRK Construction account was kept by Rhonda Otto."

Otto testified: that she got involved with the CRK Construction account when "Bob Kavaney, who is Charles Robert Kavaney, ... left for the seminary, he had me take care of the personal matters for him, and that was something done not under the employ per se of Kavaney Realtor; it was done—it was done because I was asked by Bob"; that she took "care of those CRK matters ... outside of the office" of KRD; that the CRK Construction Account did not have anything to do with KRD; that she took care of Bob Kavaney's accounts separately—"It was not something under employ"; and that "[a]ny bills that were paid out of CRK, anything I did for Bob Kavaney, was not done on Kavaney time, it was done on my own time."

A second checking account excluded from coverage was one belonging to John Kavaney's mother, Louise Kavaney. John Kavaney testified: that "we were managing her personal affairs"; that the account was in the name of Louise Kavaney or John Kavaney; that it "consisted of monies belonging to the late Louise Kavaney"; that the account was in the care of KRD "because part of Rhonda Otto's duties were to keep track of the bills and expenses for several years while she was hospitalized and then when payment, you know, was ordered she would make the check out and I would sign it"; that "this was an account that [Otto] was taking care of under my employment"; and that he does not contend that expenditures from that account for Louise Kavaney's care "really had anything to do with the business" of KRD.

In light of the foregoing testimony, we conclude that, with respect to the CRK Construction account and the Louise Kavaney account, the trial court's finding that "these accounts were not usual or incidental to the plaintiff's business" is not clearly erroneous. With respect to other accounts, however, we reach a different conclusion.

John Kavaney testified without dispute: that "[w]e've been involved in numerous land developments"; that "the main party of people that we represented for several years was the Register family"; that the Register development projects have been very successful; that KRD is "a small real estate firm. Originally it was just my brother Charles and myself.... Then he left in 1981", and finally, "mainly we were land developers."

■ Of a number of bank accounts maintained by KRD, John Kavaney testified without dispute: that account 13–725 at Norwest Bank was originally called the LK Apartments account and later changed to Gateway Commons; that

> "LK Apartments was an account that was managed by us, but it was in the name of my mother, Louise Kavaney, and it was for apartment houses and rental income. And then after she passed away in 1985, the name of the account was changed to Gateway Commons because we sold the apartments and then we turned it into a commercial account representing lease payments that we received from Gateway Mall.";

that account 029–785 at United Bank "was called Gateway Commons, which was another apartment house account, rental account. That was owned by myself and my brothers." (This account was also referred to as "Kavaney Apartments", which was charged a management fee by KRD, and "KAVANEY APTS." appeared on the check blanks. John Kavaney testified that the account was later changed to "Gateway Commons because this is where we now were involved in a plat known as Gateway Commons and developing land."); that account 608–307 at United Bank, called Gateway Commons Money Market Account, was "like a savings account, for that same

funds"; that account 42–462, Register Commercial Park, at Bismarck State Bank, "was the operating account for Register commercial accounts or the Register commercial development that we were supervising"; that account 1601–389 at First Bank, the High Meadows Account, "was owned by the Register family that we supervised with the deposit of funds from the development of the High Meadows plat area."; that the Register Commercial Park account and the High Meadows account were owned by different Registers; that Otto had signatory authority on the High Meadows account, but not on the other accounts; that after Otto left her employment in January 1986, "we discovered that there was a lot of transfers to the account called CRK Construction ... large amounts of money were being funneled into the CRK account ... [f]rom ... [j]ust about all accounts. Mainly the Register and the LK accounts."; that "these were all monies that Kavaney Realtor & Developer was responsible for"; and that after monies were deposited in the CRK Construction account from the other accounts, "we would notice that the transfers that were coming out of CRK were going to ... a personal account of Rhonda Otto."

From our review of the evidence, we are convinced that a mistake has been made with respect to the accounts other than the CRK Construction account and the Louise Kavaney account. Those other accounts constitute an integral part of the method by which KRD does business. KRD had maintained those other bank accounts for other people for a number of years, depositing money in them and drawing checks on them in the ordinary course of events. Those activities were customary, prevalent, common or ordinary between KRD and its clients. The maintenance of those other accounts was "usual or incidental to the Named Insured's business." We conclude that, with respect to those other accounts out of which Otto misappropriated funds to herself or for deposit to the CRK Construction account, ultimately, to be misappropriated to her personal account, the trial court's finding "that these accounts were not usual or incidental to the plaintiff's

business," is clearly erroneous. Therefore, those other accounts were covered under the terms of the insurance policies.

�as Travelers asserts that the trial court erred in finding that the accounts were within KRD's care, custody or control, one of the prerequisites to coverage under the policy. "The words 'care, custody and control' have been held to mean 'in charge of' or 'in charge' by the decisions." *Maryland Casualty Co. v. Golden Jersey Creamery,* 389 S.W.2d 701, 703–04 (Tex. Civ.App.1965). A thing is in the charge of an insured, within the meaning of the policy, when that insured has the right to exercise dominion or control over it. *See Cohen & Powell, Inc. v. Great American Indemnity Co.,* 127 Conn. 257, 16 A.2d 354, 355 (1940). By maintaining the bank accounts of others, making deposits to them and drawing checks on them, KRD was exercising dominion or control over the accounts and the funds in them. KRD was, therefore, in charge of those accounts. Consequently, those accounts, and the funds in them, were in the "care, custody or control" of KRD and the trial court's finding to that effect is not clearly erroneous.

KRD contends that the district court erred in concluding that the three insurance policies involved here constitute one continuous policy and that Travelers' liability is noncumulative and cannot exceed $22,000. In granting partial summary judgment, the district court explained the bases for its conclusion:

"The insurance contracts for the years 1983 through 1985 are identical with the exception of the policy numbers. . . .

"Section F(1)(e)(2) of the policy provides in part as follows: 'Regardless of the number of years this form shall be in force, the Traveler's total liability shall not be cumulative.'

"There is additional language in F(1)(e)(2) [*infra* ] limiting coverage. The language is not ambiguous as Plaintiff contends.

"An article in 7 ALR2d 946, entitled Fidelity Bond Renewal—Liability states at page 947 '—a bond and the renewal thereof are to be construed as a continuing contract, . . ., and where the liability of the surety is limited in the bond to a specified amount, the surety may not be liable in excess thereof, although defaults may have occurred during the different current periods of each.'

\* \* \* \* \* \*

"Defendant cited several cases it felt was supportive of its position. Two that I find to be strong cases in Defendant's favor are *Eddystone Fire, ETC v. Continental Ins.,* 425 A 2d 803 (Pa.Super.1983) and Columbia Hospital v. U.S. Fidelity & Guarant[y] Co., 188 F.2d 654 (DC Cir.1951).

\* \* \* \* \* \*

"Traveler's policy further provides coverage for loss by theft which occurred during the term of the policy and for *prior loss* occasioned by forgery or theft which was not limited to a policy period which begins and ends at specific dates. In other words, the policy in this case provides for losses from theft or forgery occurring during prior periods. This adds impetus to the argument that the policy is continuous.

"In sum, I conclude that the policy in this case is continuous and noncumulative. Traveler's liability can not exceed $22,000. Its motion for partial summary judgment is granted."

▮ The legal effect of an insurance policy is generally a question of law and, on appeal, we independently examine and construe the policy to determine if the trial court erred in its interpretation. *Sellie v. North Dakota Ins. Guar. Ass'n,* 494 N.W.2d 151 (N.D.1992); *Link v. Federated Mut. Ins. Co.,* 386 N.W.2d 897 (N.D.1986). Whether a renewal of a policy constitutes a new and independent contract or is merely a continuation of the original contract primarily depends upon the parties' intention, to be ascertained from the instrument itself. 18 *Couch on Insurance 2d* § 68:40 (Rev. ed. 1983).

Special Form Paragraph F(1)(e)(2) of the policy says:

"F. BASIS OF LOSS PAYMENT

"1. Coverages A & B—Determination of Value of That Part of the Property Sustaining Loss

\* \* \* \* \* \*

"e. Limits of Liability

\* \* \* \* \* \*

"2. As respects *theft*, the total liability of the Travelers for all loss caused by acts or omissions of any person or in which such person is concerned or implicated is limited to the limit of liability applicable to Coverage B.

\* \* \* \* \* \*

"Regardless of the number of years this form shall be in force, The Travelers' total limit of liability shall not be cumulative.

"If this form is substituted for any prior fidelity or *forgery* insurance issued by any of The Travelers Companies and the discovery period of such prior insurance has not expired, The Travelers Companies shall not be liable for more in the aggregate than the limit applicable to such prior coverage or the limit applicable to Coverage B, whichever is greater." (Italics in original.)

Coverage is limited to a total of $20,000 in each of the first two policies and $22,000 in the third, the amount under Coverage B. There is to be no cumulation of liability. This provision anticipates prior, expired, policies. In the event that a loss may have occurred during the period of a prior policy, now expired, coverage for that prior loss is limited to the greater of either the present policy's limit or the expired one's limit, but there is to be no aggregation of coverages. Some say this provision, by itself, is sufficient to find coverage of successive policies to be limited to the face amount of any one of the policies, without cumulation or aggregation. *See Eddystone Fire Co. No. 1 v. Continental Ins. Cos.*, 284 Pa.Super 260, 425 A.2d 803 (1981); *Columbia Hospital v. United States Fidelity & Guar. Co.*, 188 F.2d 654 (D.C.Cir.1951). *Contra, e.g., Globe Indemnity Co. v. Wolcott & Lincoln, Inc.*, 152 F.2d 545 (8th Cir.1945).

However, we need not decide that question because in this case, there is more.

Special Form Paragraph E provides for extended coverage:

"E. EXTENSIONS OF COVERAGE

"Such insurance as is afforded by this form also applies as described below, but unless otherwise specified these extensions do not increase the limit of liability.

"1. Coverage A or B applies to:

\* \* \* \* \* \*

"(e) Prior Fidelity or Forgery Insurance—loss which would have been recoverable under prior fidelity or *forgery* insurance provided:

"(1) there is no lapse in coverage between such prior insurance and insurance under this form;

"(2) such loss would have been recoverable under this form had this form been in effect when the acts causing such loss occurred; and

"(3) the time within which to discover loss under such prior insurance had expired;

"however, the amount of insurance under this extension shall not exceed the limit applicable to Coverage B in the amount for which it was written as of the time such prior insurance was replaced; or the amount recoverable under such prior insurance, if the latter be smaller;" (Italics in original.)

This provision extends the coverage of the present policy to losses caused by acts occurring while a prior policy was in effect. The opening sentence declares that the extension of coverage does not increase the limit of liability. It extends the present policy's coverage to a loss which would have been recoverable under the prior policy if there were no lapse in coverage and the loss would have been recoverable under the present policy, had it been in effect at the time of the acts causing the loss, and if the time within which to discover losses under the prior policy has expired. The amount recoverable for such a loss under the present policy, however, is limited to the limit applicable to Coverage B of the present policy or the amount recoverable under the prior policy, if that is smaller. We agree with the district court that this

**342**

provision "adds impetus to the argument that the policy is continuous." *See Eddystone Fire No. 1 v. Continental Ins. Cos., supra.*

The combination of the provision against cumulation of coverage and this provision, extending coverage to prior losses, indicates the intention that the policies constitute one continuous and noncumulative contract. We conclude that the district court correctly construed the insurance policies as constituting one "continuous and noncumulative" contract, and that Travelers' liability cannot exceed $22,000.

The judgment is affirmed, insofar as it awards KRD $499.75 to reconstruct records taken by Otto, reversed, insofar as it denies KRD any further recovery under its insurance policies, and the matter is remanded for further proceedings, if necessary, to determine the amount of Travelers' liability, and to enter judgment.

VANDE WALLE, C.J., and LEVINE, NEUMANN, SANDSTROM and MESCHKE, JJ., concur.